Good morning everyone and welcome to all. Before we start, let me just say that we will be quite generous with time if we run into any technical difficulties. Our experience thus far as a court with remote arguments has been positive, but as you all know from day to day with conference calls and Zoom connections and what have you, we sometimes experience difficulties. So if we do, no worry, everyone will have ample time and we'll take a 10-minute break after this morning's second oral argument. So I think with that we're prepared to begin with our first case of the morning, number 2018-14, the John MacIver Institute v. Governor Tony Evers. And we start with Mr. Sear. Mr. Sear, good morning and you may begin when you're ready. Good morning, Your Honor. Thank you. Your Honor, this Halloween, what's truly scary is the idea that the governor can target award-winning professional journalists for exclusion from the Capitol Press Corps based on their viewpoint. This court should follow the U.S. Supreme Court's structure for press freedom claims and more specifically the precedence of its sister circuits, the first, second, and D.C. in recognizing a right of equal access among journalists to generally available government information and events. And they should find this right is protected by strict scrutiny, which is the test that we extend to fundamental rights like this one. And if you reach that conclusion, you don't have to look into the question of viewpoint discrimination because it's sort of strict liability offense. The mere denial of access in and of itself, I think, is sufficient to find a constitutional violation. Now, Mr. Sear, in the briefs, you say that the non-public forum analysis for free speech is not the best fit for the situation. By that token, neither is your freedom of press analysis. We usually apply strict scrutiny when the government is trying to stop the press from publishing or disseminating some information. But no one is stopping anyone from printing or publishing or disseminating anything here, are they? No one is forbidden to report on the event or the facts of it. Am I right? I think your honor should start by looking at the Minneapolis Star Tribune and Arkansas Writers Project cases from the U.S. Supreme Court. You're right. In many other instances, the court uses strict scrutiny to look at prior restraints, and that's not the case we have here. But Minneapolis Star Tribune and Arkansas Writers Project are both cases where the court was looking at discrimination amongst and between different types of news outlets. In one case, it was discrimination against newspapers. In the other case, it was discrimination against a particular narrow class of news magazines. Mr. Sear, it's Judge Scudder in the courtroom. Let me just pause you for a second with apologies. On the screen that I'm looking at, I've lost our colleague Judge Mannion. I have as well, your honor, now that you mention it. So have I. So let's stop the clock for, let's stop our timer. Dan, come back. Oh dear. No problem. Mr. Sear, we'll let you pick up once we get this organized and catch your thought again. So no worry. I'll be patient, your honor. In fact, we may need to start over. We'll have to see when we lost him. I noticed it. I don't know when I noticed it, but we may have lost him early on. I think we had him until. Okay. Yeah. He's reconnecting. I'm the one that thought there would be a problem. This is the first time I'm using my brand new laptop. It's nice to be able to see your face, Judge Rohner, rather than just hear you through the phone now. You know, in other oral arguments, it's been more of a remote presence. So. Right. Oh, dear. This way. I thought about dressing for Halloween, but. If I may admit, ma'am, I wore a Star Wars tie today. It's just part of the occasion. Judge Mannion, do you recall when we lost you? Right away. Okay. So why don't we start the clock? For whatever reason, it's about all we can do. I'm really sorry. No. We're sitting here and it didn't go on. No, no need to apologize. Why don't we just begin again? Judge Rovner asked a question, I'm sure she can ask it again. And I think in fairness to all, let's just start again. She asked a question about the application of. Thank you. Mr. Seward had begun his argument. So maybe we, you know, and then I broke in. Yeah. Mr. Seward, you want to just take it from the top again? Yeah. Okay. Well, let's take two. We'll do. Well, good morning, Your Honors. Again, this Halloween, what's truly scary is the idea that the governor may selectively target two award-winning professional journalists for exclusion from the Capitol Press Corps based simply on their viewpoint. This court should follow the U.S. Supreme Court's framework for press freedom claims and join the first, second, and D.C. circuits in recognizing a right of equal access amongst journalists to generally available press information. And in doing so, no finding as to viewpoint discrimination is necessary because it's a sort of strict liability offense. The governor's motive doesn't matter. If, however, this court decides to use form analysis, as the district court did, I think the plaintiffs should still win because their viewpoint discrimination here is obvious. The facts tell a very scary story. And with that, Judge Rovner. Okay. This is great to have a rehearsal. You believe that the non-public form analysis for free speech is not the best fit for the situation. And I might somewhat agree with that. But I also think at this point, neither is your freedom of press analysis. Because we usually apply strict scrutiny when the government is trying to stop the press from publishing or disseminating some sort of information. You see here, no one is stopping anyone from printing or publishing or disseminating. There's no one that's forbidden to report on the event or the facts of the event. This is not a public forum like a sidewalk or a park. It's a non-public forum to which the governor invites members of the press. Yeah, Your Honor. So I think the better starting point maybe for the press freedom analysis is the Supreme Court's decisions in Minneapolis Star Tribune and Arkansas Writers Project. Because you're right, this isn't sort of a traditional case of prior restraint, like say the Pentagon Papers. But in Minneapolis Star Tribune and Arkansas Writers Project, the Supreme Court was dealing with a very similar situation. Namely, that the government was discriminating against particular news outlets. In Arkansas Writers Project, it was a narrow class of alternative news magazines. In Minneapolis Star Tribune, it was a class of – a narrow class of large newspaper publishers. And so in those instances too, no one was being prevented from printing, but they were subject to these apply strict scrutiny and both of those laws. And I think we're in a similar place here where the governor has discriminated against a particular news outlet and said, you guys and only you guys are prevented from coming to my press conferences. And that's the same sort of discrimination that was at the heart of the Minneapolis Star Tribune and Arkansas Writers Project. Well, what if – I mean, under your strict scrutiny proposal, if the governor's press room holds 30 reporters and 300 are SVP that they would like to attend the function, are you saying that the governor is going to be put in a position, a situation, where he has to come up with a compelling reason why each of the 300 others were chosen? No, ma'am. In our briefs, I think we use the Air Force One analogy as the right one, the right that there are a limited number of seats. Another example would be the Supreme Court of the United States own press room, which has a limited number of seats. And there you just do a kind of traditional compelling interest and least restrictive means analysis. Mr. Sir, you make that sound easier than I worry it may be as a practical matter. I know you used to work in the White House, sir, so I'm sure you've seen the way the press corps runs. Well, let's – the White House press room is an easy thing for all of us to picture in our minds because we see it so often over the years. And I think Judge Rovner, she's undoubtedly correct about a limited number of seats in there. And how exactly, if we were to adopt strict scrutiny, how is a very nuts and bolts practical matter would the narrow tailoring prong of that test work? So what do you propose with – take, for example, let's just hypothesize that – is it Osmulski? Just suppose he wrote a letter to any president over the years and said, I'd like to attend the upcoming White House press conference, and he was denied. How should a court go about an So I think neutral criteria are the right analysis, and a simple rule like circulation of a newspaper or other media outlet would be appropriate. So if the White House wrote back to Mr. Osmulski and said, you only have 1,000 people who visit your website and we've got to keep room for The New York Times, I think that would be appropriate. What we have here is very different, though, because we're talking about a media list of 800 people that the governor is advising. So this isn't a problem of the 31st person trying to get on Air Force One. This is a really large list that they blast out to, and my clients are being denied access to that list, not because they don't have division circulation, not because they aren't award-winning professional journalists. It's because of their viewpoint. I would like you to help us a bit more with Judge Scudder's question to you. What is the criteria by which you think the governor can limit access? What do you think is a means that would satisfy what you think is the test here, the least restrictive means? In other words, I want to know what your invitation and your admission criteria would be. Sure, Your Honor. So I think two things. One obvious and easy one is circulation. If you're dealing with the limited question of how many seats on Air Force One, if you give them out on a neutral principle like circulation, I think that's acceptable. When you're dealing with an open-ended list, like, say, the media advisory list, we've also said in our briefs that sticking to professional journalistic norms is an appropriate criterion, that it's okay for the government to say you have to obey embargoes, you have to respect the difference between on the record and off the record. I think really the question is, in that sort of situation, can the government start by setting up really high barriers to entry, like we have in these supposed criteria, or should we have a more open access policy where if somebody betrays those journalistic norms, they lose their access? I do not, to be very honest with you, I am not happy with the idea of how large the circulation is. That would cut out many, many state or city newspapers, magazines that have much smaller circulation, but perhaps a great deal more interest in what is happening in the governor's office. I would agree with you, Judge Roper. Obviously, for my client, we want as open an access as possible. We think that one of the reasons strict scrutiny will be not only constitutionally appropriate but helpful is that it's going to open up this question of press access and ensure that smaller publications and newer publications have access to these sorts of press events, where right now the government is restricting access and preventing either newer voices or smaller circulation voices from participating. Mr. Sir, the second, I'm sorry, Judge Roper, go right ahead. No, no, no, go ahead. One of the other concerns that I have is, I understand your argument. As you're articulating it today, it aligns exactly with what you argue in the brief. One of the concerns that I have, though, is whether the actual record evidence supports some of the propositions you're making. When you say that it's, as you put it, clear or obvious that there's viewpoint discrimination going on or that the institute or Mr. Osmulski has been singled out, what can you point us to in the record to demonstrate that as an evidentiary matter? Sure, Your Honor. I think you start with Melissa Baldoff's declaration, which is actually the defendant's introduction evidence. There, she describes the process by which McIver has been denied access. It starts with the fact that when the administration first came into office, she made a judgment call based on her own experience with no standards, just subjectively, to exclude McIver, even though we know, and this is one of the exhibits that we included, Democratic Party staffers, legislative staffers, and outside lobbyists. She was saying, McIver, you're not a news organization. You can't get on the list. At the same time, we know from that exhibit of the old list that there were a number of organizations on that list who failed this subjective test that she had made up. We then sent in a demand letter, which is also one paragraph, saying, well, we use sort of generally neutral criteria, and sorry, you guys are still out. And that's one of the exhibits in the record. We know at the end of the day, though, don't we, that, and maybe Mr. Johnson-Karp can confirm this, we know at the end of the day that the exclusion, as it stood at the time the district court entered judgment, was based upon the criterion outlined in the June 26, 2019, memorandum. Do we not? That's right, Your Honor. But I think we've shown, I think, pretty clearly that the criteria in the June memorandum are still being applied unfairly, that, for instance, the district court and the state have said, well, you have to be an objective journalist under these new criteria. And yet there are a number of editorial page writers and opinion columnists and radio talk hosts who are not objective, who don't pretend to be objective, whose job isn't to be objective. So I don't know how to assess that against the backdrop of the record we have before us. That's the difficulty that I have. So let me just put it in terms of a question, or maybe it's an observation, and you can react to it, and Mr. Johnson-Karp can. If you came in and you said, look, I want to compare the treatment afforded Mr. Osmulski and Ms. Jones. And the treatment is night and day different. Ms. Jones happens to be a journalist that writes favorable commentary for the governor. She, too, is affiliated with a think tank. You see where I'm going with that. And I just don't see evidence in the record of that. If I did, you know, some of the cases that you draw upon, the Churchill-Lukumi-Babaloo, for example, it's a free exercise case, I know, but some of those, you know, discrimination and application cases, they'd have a lot more force because you'd have an evidentiary basis for your argument. And I just don't see anything like that on the record before us. So I think part of that is because there's not another think tank in Wisconsin that does what the McIver Institute does, that sponsors a news service as one of its subsidiary activities. But what we can point to are other publications that engage in the two things that McIver is between the editorial activities and the news side of the news service. And can you ground that observation in the record before the district court? That's in Melissa Baldass's affidavit, Your Honor. Okay, what page and what paragraph? I have it right in front of me. I would have to maybe tell you a 28-J letter very specifically. But she says in her affidavit that she rejected McIver for engaging in political advocacy, for engaging in not enough, you know, not being a news organization, but being primarily about advocacy. And I would just point to, for instance, you know, any newspaper that has an editorial page engages in advocacy, in fact, engages in more advocacy. My client is a C3, cannot endorse candidates. It doesn't lobby on behalf of legislation. And yet the Milwaukee Journal Senate editorial page frequently endorses candidates and frequently lobbies in favor of particular pieces of legislation. And not only are there hard news reporters admitted to the press conferences, their editorial page writers are on the governor's press list. So I think that's real problem here is that the criteria have been applied in a way that specifically excludes McIver when for any other organization that engages in news organization that engages in similar or even more pronounced, quote unquote, advocacy, they're still in the room because they fit a more traditional media model. I have to say that I don't think that the question here is whether it's a legitimate news organization or even if it, whether it's whether the governor's office could exclude them based on non-content based criteria. I think that's the issue here. So I would agree with you, your honor, that the governor can have neutral non-content based criteria. As I've been discussing with Judge Scudder, I think they've been discriminated against based on their viewpoint. But I would also say if the criteria the governor says he's using were applied equally to other news outlets, then they should also be excluded, right? If you can't engage in policy advocacy as an organization, not just the news reporters, but the entire news organization can't engage in advocacy, then any newspaper with an editorial page or any radio station with an opinion talk show, any TV station with an opinion talk show should also flunk those and yet they're all still allowed in the room and it's only my client that's excluded from the press conferences. Mr. Sir, you're into your rebuttal time, so why don't we let you save a couple of minutes and we'll hear from Mr. Johnson Carp. I appreciate that, your honor. Thank you. Thank you, your honors. Good morning. May it please the court. A clear precedent from both this court and the United States Supreme Court forecloses just the type of equal access the media that the McIver Institute is asking this court to recognize today. In my time today, I'd like to discuss that in terms of three general concepts and respond to the court's discussion with Mr. Sir. First of all, nothing in the Supreme Court's precedence recognizes this press clause claim that they rely on. There is no distinction between a press clause claim and a speech clause claim. The court's decision in Houchens makes this very clear. Second, the highest level of scrutiny that would be applicable here is that of the non-public forum, which is effectively rational basis review plus a viewpoint neutrality requirement. And as we discussed in the brief and as Judge Rodner pointed out, there is a rough fit with forum analysis, depending on how we view the forum here today. But I think the bottom line is that at most the standard for a non-public forum is what would apply. And applying that standard, the non-public forum standard and its viewpoint neutrality requirement, what we see is that the governor's standards do meet that viewpoint neutrality requirement and as applied to McIver were properly applied. Now, I'd like to first take up some of the discussion that the court had with Mr. Sir about how to draw the lines, what standards a court should lay out in deciding how a right like this would be narrowly tailored. And that's exactly the type of inquiry that the Supreme Court in Houchens and in its predecessor case, Brandsburg versus Hayes, explicitly rejected. This is a extreme manageability problem that the court said courts shouldn't be getting into this task of deciding who constitutes media and what types of governmental events or governmental information the so-called media would be as a constitutional matter allowed or rather required to have access under a strict scrutiny analysis. These types of questions, who are media, what governmental events are going to be open, have been and are best left to the political branches and the have a criteria that no internet only news service would be invited to press events or print media only. As a constitutional matter, your honor, I think so. I think that would be a viewpoint neutral objective criterion. But again, that points up the political process issue. The voters would likely be extremely frustrated if their chosen outlet couldn't get access. And the way that that has changed is through the political process, not as a constitutional matter saying all internet organizations should have first amendment access. In what ways does the governor's criteria differ from that used by the U.S. Congress, the Wisconsin Capital Correspondence Board? Why did the governor choose to alter the criteria in that way? I apologize, your honor, but I don't recall the specific distinctions. When I looked at the standards from Congress, they seemed very similar. So they really aren't meaningfully different as far as I can recall. What we're looking at is whether, I think fundamentally, is this organization principally a news organization? Does the organization and its correspondence avoid real or perceived conflicts of interest? And on those bases, the governor's office concluded that the MacIver Institute, which is a in, as they describe it, center right policy advocacy, that this organization is not principally a news organization, and for that reason, did not qualify under the governor's media access criteria. Mr. Johnson-Karp, suppose, for example, I know this is hypothetical, that Mr. Osmulski resigned from the institute this afternoon and became a freelance journalist. It does seem from the record that he's quite an accomplished journalist, and applied for access to the media list as a freelance journalist. How would he be treated at that point? Well, just for the record, I'd like to underscore that the governor's office recognizes Mr. Osmulski's resume, and that is not the disqualifier here. I think the issue currently is the collaboration with this think tank. I think in the instance of a freelance journalist, the criteria would, one of the criteria is involvement with an established news organization, one that's been, I believe it's 18 months in publication or in broadcasting, and so that might be an impediment in that circumstance, but I think as Mr. Sirr has bona fide journalist who, for example, is a freelancer, then the governor's office might consider allowing that individual onto the media advisory list. Presumably under the same viewpoint neutrality, right? I mean, it doesn't matter whether you have a Republican governor, a Democratic governor, you know, and any vice versa with the journalist. Isn't the point of your position that so long as viewpoint neutral criteria are being applied to admitting or denying the liberal or conservative journalist, that satisfies the applicable First Amendment standard in this situation? That's right, and I would just highlight that. I think the individual journalist's viewpoint, you know, may or wouldn't play in, you know, it's whether the organization that they're publishing for has this, whether the criteria are neutral as to the organization. You know, I'm not saying somebody who votes for a, you know, a Democrat or a Republican, that that would ever factor into the analysis. Anne, you're... Yeah. No, go ahead, Judge Rogan. I'll follow up. No, no, no. Please, you follow up. So one question I have is I read your position, and I appreciate the candor of your brief. There seems to be some modesty in it, and the modesty in it is this, and it goes to the point I was asking Mr. Surabhat with respect to the evidentiary record, that if there were facts that ever developed that showed differential treatment between another think tank or an organization akin to a think tank that has a journalist on the staff, you know, akin to the role that Mr. has here, that, and, you know, they're allowed in, and MacGyver is kept out. Well, that lawsuit may be very different, because then you have a situation where the criterion outlined in the June 2019 memorandum, while neutral on their face, are being applied in a discriminatory way. Have I read your position correctly? I know those facts are not here, that's one of the points you'd make, but are you acknowledging that if they did hypothetically exist that, sure, you could challenge a policy that way? I don't know that there would be the ability to challenge the policy. I think that would maybe be The application of the policy, right? So it just called the Smith Institute, and journalist Jones was admitted in because, I don't know, they have a conservative or liberal or whatever viewpoint you want to, it doesn't matter. That would certainly be a closer case. Yes, that would have more of the evidentiary indicia of, that could support a viewpoint discrimination claim. But here, as the district court noted, the closest comparator, the journalist for the Wisconsin Policy Forum, Jason Stein, was also excluded based on these same criteria. So, in that sort of one-to-one comparison, Your Honor touched on it exactly, that the record here just doesn't show the discrimination. And I hesitate to commit to the idea that such a one-to-one comparison would, in every instance, support a viewpoint discrimination claim. But yes, that would be a closer case than what we have here. Is there anything MacGyver could do to ever get included on the invitation list going forward? I think, in theory, there is something that, there are things that an organization could do. I don't know that a think tank committed to policy advocacy would meet these criteria. That assumes that these criteria stay fixed. But as we've discussed, that's subject to the political process. If enough people raise a concern that they want the governor's press events thrown open, then the governor might respond to that. In which case, going back to the earlier example, if everybody says, let all media or internet outlets attend press events, no matter what their viewpoint or circulation or anything like that, that might be a different set of criteria that could be adopted through the political process. But the criteria themselves, I think, barring a change in the MacGyver Institute, would not allow for the Institute to gain media access. So one of the reactions I have to that, and I know we're talking outside the record here, I'd be quick to acknowledge that, is that that position risks elevating form over substance a little bit. And what I mean by that is it doesn't seem to me, or the world doesn't seem to be one where a think tank of any particular persuasion could not also have a quite meaningful news outlet as part of its research mission and thought development, knowledge development, et cetera, et cetera. And so it surely can't be the case that the MacGyvers of the world have to separately incorporate a subsidiary that is dedicated to the dissemination of news, does it? I don't know that it would have to be a formal subsidiary, but there does need to be some separation between the very clearly advocacy-focused organization and the journalistic entity. And I think, I guess to qualify my previous answer, that type of change could result in the MacGyver News Service's admission in the future. If there were some advocacy organization and also met the additional criteria of avoiding the appearance or actual perceived conflicts, that if there were such an entity, then yes, that they could qualify under the existing criteria. But as Judge Scudder, you recognized on this record, we do not have that. Yeah, I mean, that's just it. And I mean, it does seem to me in reading, I mean, Mr. Osmulski, to his credit, seems to be quite an accomplished journalist, indeed an award-winning journalist. And he says in his declaration or affidavit in paragraph four that he produces what looks to be like a weekly television program. But they really didn't develop the record, at least as I can look at, as I see it, on what role this news commentary program plays in the overall mission, et cetera, et cetera. And that, so it's almost like there's another lawsuit or something that we're talking about around this one and the record in this one. Well, not to invite another lawsuit, but it's certainly not this case. And I think as long as we are outside the record, looking at the MacIver Institute's website and its news tab, there really is no difference. And I think that's why the record is what it is, is that at the preliminary injunction stage, and then the request to convert that to summary judgment, there just was no evidence that MacIver could put in to show that it had in fact, or could in fact satisfy these neutral criteria. So they had the opportunity to present evidence that the governor's application of these criteria was wrong. They didn't put in that evidence and instead doubled down and asked for summary judgment on the narrow record that effectively shows that they are a policy-focused think tank, rather than a primarily journalistic enterprise. Could I, you all hear me? Yes, your honor. Oh, okay. Well, two things. One is as far as the individual reporters, if the subject matter of the, we'll call it the news conference, is limited. It's a hypothetical prison reform, for example. There are only certain people that might want to address that issue or know something about it. And that may be more confining if that's the subject matter of the press conference. Then it may be more selective. And then the other thing is for the individuals involved here. They are affiliated, of course, with MacIver. But what if there, as an individual reporter, if there is, we'll just take that other issue, would they have a different purpose for being there? And would the press conference rightfully be confined to that issue? I know that's a little bit vague, but that's the question that I'm generating when I listen to this discussion. Just so I'm understanding the question, is your honor asking how the subject matter of a particular press conference could be used as a limiting criteria? Yeah, it's going to target some people who may have expertise or have interest in that narrow issue. It's not just an open press conference where someone has a, you want to be there just because it's a press conference and you think that there ought to be access. Here we're talking about the organization, which I understand that MacIver has a think tank. But then we talk about Mr. Osmulski, who apparently is a talented person that may be the type that he would come in for a specific issue in the press conference, if that's what it's called. Or it may be one that could be confined to people that know something about the subject, and it's something they're trying to resolve. It's been a long time since I was in government, so I don't pretend to know what the best way to operate in a circumstance like that. Well, I think the idea of limiting access based on subject matter focus or expertise, that there is room for that type of determination, both in the case law and within the access criteria. I apologize, I don't have a site, but we discussed in our brief the idea that depending on the subject matter of the event, the governor's office might reach out to, for example, local press on a specific local issue, or as your honor indicated, individuals interested in prison reform, if that's what the topic is going to be at issue. There's room for that sort of determination within the objective neutral criteria. And I don't think that that would be problematic. But the bottom line is, the people to whom those invitations would go would still need to meet the media access criteria. We would still be talking about the universe of journalists that have satisfied the governor's viewpoint neutral access criteria. I see that my time is up. Unless the court has any other questions, we would ask the court to affirm the judgment below. Thank you, your honors. Thank you, Mr. Johnson. Mr. Sir, you have, let's call it two minutes left. I'll make two points, your honor. First, to follow up on your question earlier about the record, I point you to Melissa Baldoff's declaration, paragraphs 22 to 25. And I'd especially point out paragraph 24 is a great example of the problem here. So she says, well, the way you know, MacIver engages in policy and politics is a reporter from MacIver attended a Republican event on a panel. And that's true. On that panel as well, was a reporter from WTMJ and a reporter from WIBA, two news talk radio stations. If you look at exhibit 15-1, which is the new media list, you'll see that WTMJ and WIBA are still both on there. But MacIver is not. I don't know what, I have to be honest. I don't know what that proves, that he was. We've been treated differently, that they give a rationale for excluding MacIver, but two other news organizations that also fail that rationale are still included in the press conference. Right. It just, it shows the target, the way in which MacIver has been treated differently than everybody else. And I think that really gets to this general conversation we've been having with Gabe about Mr. Johnson Carp, about whether MacIver is a news organization. And he never explains if the problem for MacIver is it's a think tank that does policy and news. Why is that different from a newspaper with an editorial page that does both policy and politics and news? Why is that different from a TV station? And does that organization have a think tank? No, but they do both. We failed because allegedly we do both policy and news. A newspaper does policy and politics on the editorial page, and it does news. A TV station like CNN, it has shows that do policy and politics advocacy, like a Sean Hannity show. And then there are other reporters who do news. And yet those news organizations are all included. It's only MacIver uniquely because its corporate parent is a think tank that's treated differently. But the same principle that a news organization can do both policy and politics, like on an editorial page and news, is applied differently for everybody else. Mr. Sir, thanks to you. Mr. Johnson Carp, thanks to you. We'll take the case under advisement. Let me just check real quick. Judge Rovner, Judge Mannin, any final questions? Thank you. Thank you, everyone. Okay, thanks to all. And we'll proceed to our second case of the morning.